



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed September 9, 2021**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FT. WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| F. SAMUEL TALLIS A/K/A SAM TALLIS, | § | CASE NO. 19-41821-MXM-7 |
| | § | |
| DEBTOR. | § | CHAPTER 7 |
| | § | |

| | | |
|---|---|---|
| UNITED STATES (IRS), | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | ADVERSARY NO. 19-04113 |
| | § | |
| F. SAMUEL TALLIS A/K/A SAM TALLIS, | § | |
| | § | |
| DEFENDANT. | § | |
| | § | |
| | § | |
| | § | |

## <u>MEMORANDUM OPINION</u>
*[Relating to Adv. No. 1]*

1

The Court held an eight-day trial to determine the *United States' (IRS) Complaint to Determine Dischargeability*[1] (the "***Complaint***") filed by the United States of America on behalf of its agency, the Internal Revenue Service (the "***IRS***"). The IRS seeks to deny F. Samuel Tallis a/k/a Sam Tallis ("***Mr. Tallis***") a discharge of his more than $15 million of unpaid 2012 federal income tax liability pursuant to 11 U.S.C. § 523(a)(1)(C). For the reasons stated below, the Court finds and concludes that the IRS satisfied its burden to prove a nondischargeable claim against Mr. Tallis under § 523(a)(1)(C). Therefore, the Court will enter a judgment excepting Mr. Tallis's unpaid 2012 federal income tax liability from discharge.

## I.  JURISDICTION AND VENUE

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a). The Court has constitutional and statutory authority to enter a final judgment in this matter.

## II.  BACKGROUND[2]

### A.  Mr. Tallis's Education and Work Experience Background Prior to 2011

Mr. Tallis earned an undergraduate college bachelor's degree and took some master's level liberal arts courses at Texas Christian University but did not complete his master's degree.[3] Thereafter, Mr. Tallis attended law school at Texas Wesleyan University Law School in Fort Worth, Texas, and St. Thomas University College of Law in Miami, Florida, where he earned a

---

[1] Adv. No. 1.
[2] Citations to IRS exhibits will be "Ex. G-[exhibit number]" and Tallis exhibits will be "Ex. T-[exhibit number]". Citations to witnesses' testimony will include the witness's last name, testimony transcript abbreviated "Test. Tr.," Adv. ECF Number, and pinpoint citations as "[page number]:[line number(s)]."
[3] Tallis Test. Tr., Adv. ECF No. 88, at 191:15-24.

law degree.[4] Although Mr. Tallis obtained a law degree, he never sat for a bar exam or became licensed to practice law in any state.[5]

Mr. Tallis testified that he did not take any accounting or tax related courses during his undergraduate studies, post-undergraduate studies, or in law school because he "stayed out of every—anything that had to do with numbers" and was "not good with financial stuff. And especially taxes."[6]

After graduating from law school, Mr. Tallis worked at a title company,[7] and then he worked as an oil and gas landman, both in-house and as a contract laborer.[8] Thereafter, in or about 2009, Mr. Tallis began to develop his own potential strategies for oil and gas projects.[9] Mr. Tallis testified that he began to "look for trends" and "lease plays" throughout the United States.[10] Beginning in 2009 through early 2011, Mr. Tallis focused on a potential "lease play" opportunity to acquire, bundle, and sell mineral leases located in the Bakken shale formation—specifically in and around Daniels and Sheridan Counties, Montana.[11]

## B. Mr. Tallis acquires Shale Exploration, LLC, and forms Tallis Group, LLC

Meanwhile, during 2010 and into 2011, Black Pearl Exploration, LLC ("***Black Pearl***")— of which Mr. Sidney James Greehey ("***Mr. Greehey***") was a 50% owner[12]—and Orion Resources, Inc. ("***Orion***") developed a joint venture project. This project also focused on mineral lease play

---

[4] Tallis Test. Tr., Adv. ECF No. 100, at 13:4-15 and ECF No. 92 at 120:11-16.
[5] Tallis Test. Tr., Adv. ECF No. 100, at 13:16-24.
[6] Tallis Test. Tr., Adv. ECF No. 100, at 13:4-15.
[7] Tallis Test. Tr., Adv. ECF No. 100, at 13:25 – 14:7.
[8] Ex. T-20 at 8:8-10.
[9] Tallis Test. Tr., Adv. ECF No. 100, at 192:19-22 and ECF 102 at 73:21 – 80:25.
[10] Tallis Test. Tr., Adv. ECF No. 102, at 75:20-23.
[11] Tallis Test. Tr., Adv. ECF No. 102, at 75:2 – 76:10; 80:13-14; and Tallis Test. Tr., Adv. ECF No. 100, at 192:19-22.
[12] Greehey Test. Tr., Adv. ECF No. 101, at 62:5-6.

opportunities in substantially the same locations in Montana within the Bakken shale formation.[13] Black Pearl and Orion named their joint venture project the "Jayhawk Prospect" (the "*Jayhawk Prospect*").[14] The Jayhawk Prospect provided, in part, that Shale Exploration LLC ("*Shale Exploration*")—a limited liability company in the State of Texas that Orion formed on July 30, 2009[15]—would acquire mineral leases from land owners and then bundle and sell blocks of contiguous mineral leases to a drilling company to develop and monetize the mineral leases.

At some point in late 2011 or early 2012, Mr. Tallis acquired Orion's interests in the Jayhawk Prospect and in Shale Exploration, becoming the sole owner of Shale Exploration.[16] Also in 2012, Mr. Tallis formed and became the sole member of Tallis Group, LLC ("*Tallis Group*").[17] As discussed in more detail below, the United States District Court for the Northern District of Texas found and concluded that Shale Exploration and Tallis Group constitute alter egos of Mr. Tallis.[18] Mr. Tallis, Shale Exploration, and Tallis Group will together be referred to as the "*Tallis Parties*".

At or about that same time in 2011, Mr. Greehey, or companies he owned and controlled, acquired Black Pearl's remaining interests in the Jayhawk Prospect.[19] By late 2011 or early 2012, Mr. Tallis and Mr. Greehey were negotiating with various drilling companies to develop and monetize the Jayhawk Prospect.[20]

---

[13] Greehey Test. Tr., Adv. ECF No. 101, at 59:10 – 62:14; Tallis Test. Tr., Adv. ECF No. 92, at 36:21-24; *see also* Ex. T-13 at pg. 3 ¶¶ 11-12.

[14]. Greehey Test. Tr., Adv. ECF No. 101, at 59:10 – 62:14; *see also* Ex. T-13 at pg. 3 ¶¶ 11-12.

[15] Ex. G-14 at pg. 4 ¶ 16.

[16] Tallis Test. Tr., Adv. ECF No. 100, at 15:1-11; Tallis Test. Tr., Adv. ECF No. 92, at 4:11-24; Greehey Test. Tr., Adv. ECF No. 101, at 68:23-25.

[17] Tallis Test. Tr., Adv. ECF No. 100, at 33:14.20.

[18] See Exs. G-4, G-5, and G-6; *see also* Tallis Test. Tr., Adv. ECF No. 100, at 21:2-25, 34:3 – 35:2; and 75:8-15.

[19] Tallis Test. Tr., Adv. ECF No. 92, at 60:6-14.

[20] Ex. T-13 at pg. 4 ¶ 13.

In February 2012, Mr. Tallis and Mr. Greehey (on behalf of their respective companies) agreed that Shale Exploration would acquire the mineral leases from landowners and then bundle and sell blocks of contiguous mineral leases to Apache Corporation (the "***Apache Sale***").[21] To document Mr. Tallis's and Mr. Greehey's respective rights and obligations regarding the Jayhawk Prospect and the Apache Sale, Apache Corporation required Mr. Tallis and Mr. Greehey, for themselves or the entities they controlled, to enter into a *Marketing and Settlement Agreement* dated on or around March 4, 2012 (the "***M&S Agreement***").[22]

The M&S Agreement was not offered into evidence by either party and is not included in the record before the Court. Throughout Mr. Tallis's and Mr. Greehey's testimony, however, they vehemently disagreed on the rights and obligations that they and their respective companies had under the M&S Agreement. Of particular relevance in this matter, Mr. Tallis and Mr. Greehey vehemently disagreed on who was responsible for maintaining the books, records, and necessary accounting functions relating to Shale Exploration, the Jayhawk Prospect, and the Apache Sale.

According to Mr. Tallis, he and Mr. Greehey agreed that they were "going to become partners;" Mr. Tallis was "going to be the operational guy" for Shale Exploration, and Mr. Greehey would "have the back office" and had "all the accounting people" for the Apache Sale and Shale Exploration.[23] Mr. Tallis further testified that Mr. Greehey "held himself out as the CEO [of Shale Exploration] and . . . he was going to claim 60 percent of Shale's LLC. And that was always planned. And he acted in accordance with the—exercising dominion and control over [Shale Exploration] as far as holding himself out as CEO and stuff."[24]

---

[21] Ex. T-13 at pg. 4 ¶ 14.
[22] Tallis Test. Tr., Adv. ECF No. 100, at 71:6-25; Tallis Test. Tr., Adv. ECF No. 101, at 48:8-25; Greehey Test. Tr., Adv. ECF No. 101, at 68:9-15; Ex. T-13 at pg. 4 ¶ 15.
[23] Tallis Test. Tr., Adv. ECF No. 92, at 172:20-24.
[24] Tallis Test. Tr., Adv. ECF No. 101, at 48:3-7.

Mr. Greehey, on the other hand, denied that he ever agreed to such a role with Shale Exploration and asserted that "it was Shale's responsibility" to maintain its own accounting records for the Jayhawk Prospect and the Apache Sale transactions,[25] and claimed that Shale Exploration had its "own accounting people."[26] Mr. Greehey also denied that he had any affiliation or ownership in Shale Exploration, testifying that "I'm not the CEO of Shale. I have no title with Shale. I've never had a title with Shale. There's no record of me having a title with Shale" [27] and "I didn't own any ownership in Shale."[28]

Although the Jayhawk Prospect and Apache Sale were successful ventures that were very lucrative for Mr. Tallis and Mr. Greehey, and their respective companies, neither Mr. Tallis nor Mr. Greehey were apparently satisfied with the money they each received from the project, as evidenced by the subsequent litigation between them filed on December 30, 2015, pending in the 48th District Court in Tarrant County, Texas.[29] In that pending litigation, Mr. Tallis claims that Mr. Greehey owes him millions of dollars, whereas Mr. Greehey claims that Mr. Tallis and Shale Exploration owe him as much as $6 million.[30]

Overall, the Court did not find Mr. Tallis's or Mr. Greehey's testimony to be overly credible or persuasive regarding the many disputes between them. And for purposes of this dispute, the Court does not need to determine who was more credible concerning their disputes. However, what is crystal clear from Mr. Tallis's and Mr. Greehey's testimony, as corroborated by the testimony of other witnesses and the many exhibits admitted into evidence, is that Shale

---

[25] Greehey Test. Tr., Adv. ECF No. 101, at 79:22-25.
[26] Greehey Test. Tr., Adv. ECF No. 101, at 73:6-7 and 88:19-24.
[27] Greehey Test. Tr., Adv. ECF No. 101, at 119:19-22.
[28] Greehey Test. Tr., Adv. ECF No. 101, at 70:11.
[29] Ex. T-13.
[30] Ex. T-13; Greehey Test. Tr., Adv. ECF No. 101, at 87:23 – 88:4.

Exploration's books and records "are a mess."[31] On a separate but related note, the accounting records specifically related to the Jayhawk Prospect and Apache Sale transactions are, likewise, a mess. The Court found Mr. Tallis's testimony, attempting to justify the lack of reliable books and records for any of the Tallis Parties, not believable or credible.

## C.  Mr. Tallis's 2012 Federal Income Tax Return and Subsequent Litigation

With respect to Mr. Tallis and his subsequently determined alter egos—Shale Exploration and Tallis Group—substantial, taxable income was realized from the Jayhawk Prospect and Apache Sale transactions during 2012. Therefore, Mr. Tallis and his alter ego entities were required to file federal income tax returns for the 2012 tax year.[32]

### 1.  Mr. Tallis files for an extension to file his 2012 federal income tax return

On or around April 15, 2013, Mr. Tallis filed an *Application for Automatic Extension of Time to File U.S. Individual Income Tax Return*[33] ("**Form 4846**"), seeking an automatic extension to extend the deadline to file his 2012 federal income tax return to October 15, 2013. Mr. Tallis acknowledged that although he filed Form 4846 to extend his deadline to file his 2012 federal income tax return, that extension did not extend his deadline to pay his 2012 tax liability by April 15, 2013.[34]

When Mr. Tallis filed his Form 4846, he included a payment of only $25,000 to the IRS.[35] Mr. Tallis acknowledged that by April 15, 2012, he "had to make a good faith payment," but he could only afford to pay $25,000 at that time, and he did not want to "make something bounce."[36]

---

[31] Greehey Test. Tr., Adv. ECF No. 101, at 86:24 – 87:19
[32] Ex. G-16.
[33] Ex. T-13 at App.00787.
[34] Tallis Test. Tr., Adv. ECF No. 92, at 23:17-19.
[35] *Id.*
[36] Tallis Test. Tr., Adv. ECF No. 102, at 158:18-21.

Mr. James Clinton Pugh ("*Mr. Pugh*"), a certified public accountant Mr. Tallis engaged to prepare and file various tax returns, testified that his office did not file the 2012 Form 4846 for Mr. Tallis nor did he recall why Mr. Tallis paid only $25,000 with the extension.[37] Mr. Pugh speculated, however, that Mr. Tallis "was limited on how much he had available cash"[38] and that Mr. Tallis "did not pay the tax that was owed, so I know that cash flow was an issue."[39]

### 2. Mr. Tallis files his Form 1040 federal income tax return for 2012

On or around October 15, 2013, Mr. Tallis filed his 2012 federal income tax return reflecting, in part, flow-through income of $112,740,374 reported in Schedule C on his Form 1040, with net income of $41,686,059 and a federal income tax liability of $15,001,675.[40] Other than the $25,000 payment Mr. Tallis made on April 15, 2013, he has not made any other *voluntary* tax payments to the IRS for his 2012 federal income tax liability.

When preparing Mr. Tallis's 2012 federal income tax return, Mr. Pugh acknowledged that "the records were incomplete or still had to be augmented"[41] and "on the most significant portions of the income and so forth reported on the return, we had no direct records of that."[42] Mr. Pugh believed "the records were supposed to be corrected"[43] and "the information we were utilizing was going to almost assuredly have to be amended. The tax return was going to have to be amended because it was—the information was not all there."[44]

---

[37] Pugh Test. Tr., Adv. ECF No. 103, at 116:12-17.
[38] Pugh Test. Tr., Adv. ECF No. 103, at 116:12-17.
[39] Pugh Test. Tr., Adv. ECF No. 103, at 101:14-15.
[40] Ex. G-16.
[41] Pugh Test. Tr., Adv. ECF No. 103, at 96:19-20; see also Ex. G-64.
[42] Pugh Test. Tr., Adv. ECF No. 103, at 98:5-7.
[43] Pugh Test. Tr., Adv. ECF No. 103, at 140:16-17.
[44] Pugh Test. Tr., Adv. ECF No. 103, at 99:25 – 100:3.

The record before the Court is replete with compelling and uncontroverted evidence that Mr. Tallis's 2012 federal income tax return was based on inaccurate and incomplete books, records, and data, which resulted in a dubious tax obligation conclusion. But even though the Court doubts the reliability of Mr. Tallis's 2012 federal income tax return, Mr. Tallis never amended his 2012 federal income tax return, and a final court order has liquidated his federal income tax liability for 2012.[45]

### 3. How did the Tallis Parties spend the Apache Sale proceeds?

During 2012, the Tallis Parties received tens of millions of dollars in Apache Sale proceeds. Based on the admitted exhibits and testimony of witnesses, it appears that the Tallis Parties' use of the Apache Sale proceeds generally fell into one of three categories: (i) business operating expenses, (ii) business development expenses, and (iii) personal expenditures made by or at the direction of Mr. Tallis.[46]

The IRS contended that many of the expenditures in the first two categories did not constitute reasonable operating or business development expenses but constitute evidence of Mr. Tallis's attempt to avoid paying his 2012 tax debt. For example, the IRS pointed to substantial sums that were spent in 2012 and 2013 for watches, expensive meals, and other questionable expenses.[47] In response, Mr. Tallis testified that such business expenses were reasonable and necessary to ensure the success of the lease acquisition activities directly related to the Jayhawk Project, Apache Sale transactions, and other operating expenses for Shale Exploration.[48]

---

[45] Ex. G-4.
[46] See Exs. G-58, G-59, G-60, and T-26. See also the testimony of Mr. David Dodgen, Mr. Fredrick James Rice, and Mr. Tallis.
[47] See Ex. G-58; see also the testimony of Mr. David Dodgen and Mr. Fredrick James Rice.
[48] See testimony of Mr. Tallis.

Similarly, the IRS argued that substantial sums were spent on political contributions[49] and entertainment activities—such as leasing suites from the Dallas Cowboys, Dallas Mavericks, Dallas Stars, and Texas Rangers[50]—and that such expenditures were wasteful, personal expenditures made by Mr. Tallis that evidenced his attempt to willfully avoid paying his 2012 tax debt. In response, Mr. Tallis testified that such expenditures constituted reasonable business development expenditures that were necessary not only to maximize the success of the Jayhawk Project and Apache Sale transactions but also to develop future business opportunities for the Tallis Parties.[51]

The Court does not need to determine the reasonableness of the disputed operating or business development expenditures made by the Tallis Parties in 2012 and 2013 or whether such expenditures support a finding that Mr. Tallis was attempting to avoid paying his 2012 tax debt. For purposes of this ruling, the Court will assume that such expenditures were reasonable and not made by Mr. Tallis with the purpose to willfully evade payment of his 2012 tax debt.[52]

The third category of disbursements, however, are extremely relevant to the issue of whether Mr. Tallis "willfully attempted" to evade paying his 2012 tax debt. Such disbursements included the purchase of (i) at least twelve different real estate properties,[53] (ii) luxury automobiles—including at least two luxury Mercedes Benz, two Ferraris, a Range Rover, a

---

[49] Although there is no dispute that political contributions were made, Mr. Tallis and Mr. Greehey dispute who caused or encouraged the payments for political contributions.
[50] Ex. G-58.
[51] *See* testimony of Mr. Tallis.
[52] To be clear, however, the Court does not find that such disbursements were, in fact, reasonable. Rather, the Court is not considering the disputed expenditures as evidence of Mr. Tallis' attempt to willfully evade paying his tax liability under § 523(a)(1)(C).
[53] Exs. T-33, G-58.

Porsche, a Ford F-250, and several other vehicles, [54] (iii) firearms, [55] (iv) jewelry, [56] (v) investments,[57] and (vi) other expenditures including gifts or "compensation" made to family and friends.[58] In general, the Court found Mr. Tallis's testimony concerning many of the disbursements in this category to be unpersuasive and not credible. For example, Mr. Tallis acknowledged that hundreds of thousands of dollars were paid to or for the benefit of his mother and former fiancée. Mr. Tallis tried to explain and justify these disbursements as loan repayments to his mother and compensation owed to his former fiancée by Shale Exploration or Tallis Group. Despite these claims, Mr. Tallis could not produce any documentation to support the alleged loans from his mother or one W-2, 1099, or any other required tax form issued by Shale Exploration, Tallis Group, or any other entity owned or controlled by Mr. Tallis evidencing the alleged compensation paid to his former fiancée. The failure of the Tallis Parties to maintain such ordinary, customary documents and business records constituted further evidence that the Tallis Parties' books and records were woefully inadequate, a mess, and not credible.

The overwhelming and uncontroverted evidence established that, during 2012 and 2013, the Tallis Parties spent millions of dollars on this third category of disbursements, yet Mr. Tallis did not make any estimated tax payments to the IRS throughout 2012 or pay his 2012 tax obligation when it was due on April 15, 2013.

In late 2013 and into 2014, when the Tallis Parties needed cash, they borrowed substantial funds from various lenders, using the real estate properties they acquired during 2012 and early

---

[54] Exs. G-46, G-66, G-67, and G-68.
[55] Exs. G-12, G-58, G-60.
[56] Exs. G-12 and G-58.
[57] Millions of dollars were spent on failed investments including Drill-Chem LLC [Exs. G-12, G-39] and Studio 2.0 Entertainment, LLC—a venture to make movies. Tallis Test. Tr., Adv. ECF No. 103, at 170:8-10, Ex. G-58.
[58] Id.

2013 as collateral. Again, rather than using any portion of the loan proceeds to pay down Mr. Tallis's past due 2012 tax debt, the Tallis Parties used all the loan proceeds for other purposes.

After the Tallis Parties consumed much of the loan proceeds, they then began selling the real estate properties. Again, rather than using the sale proceeds to pay down Mr. Tallis's past due 2012 tax debt, the Tallis Parties used the sale proceeds for other purposes. By the time of trial, only one real estate property was still owned by the Tallis Parties—1709 Carleton Avenue, Fort Worth, Texas (the "***Carleton Avenue Home***"). The Carleton Avenue Home is the subject of several disturbing facts that will be addressed separately below.

### 4.  *The IRS begins collection activities against the Tallis Parties*

In March 2014, the IRS opened a collections case against Mr. Tallis and assigned the case to Mr. Frederick James Rice ("***Mr. Rice***"), a revenue officer with the IRS. Mr. Rice began various collection efforts against the Tallis Parties, including filing notices of federal tax liens,[59] serving summons on several parties, and seeking to identify potential assets of the Tallis Parties to levy.[60] Upon Mr. Rice's retirement in 2017, Mr. David Michael Dodgen ("***Mr. Dodgen***"), also a revenue agent with the IRS, was assigned the collections case against Mr. Tallis. Mr. Rice and Mr. Dodgen testified about their collection efforts against the Tallis Parties, and the Court found their respective testimony credible.

### a.  *The IRS Levies*

Beginning in 2014, the IRS issued multiple levies in its continued collection efforts against the Tallis Parties. The IRS levies resulted in the following recoveries: (i) $1.27 credit received on October 8, 2012, (ii) $177.62 credit received on October 24, 2014; (iii) $44.00 credit received on

---

[59] Exs. G-21, G-22, G-23, and G-24.
[60] Exs. G-50, G-59, and G-60.

June 16, 2015; and (iv) a $5,015,509.26 credit (the "*Eagle Proceeds*") received on March 12, 2019.[61] The Eagle Proceeds were received in satisfaction of a judgment obtained by Shale Exploration against Eagle Oil & Gas Co. and Eagle Wes-Tex. L.P (the "*Judgment*").[62] Mr. Tallis testified that he was instrumental in obtaining the Judgment resulting in the Eagle Proceeds, and his actions were for the benefit of the IRS and evidenced his good faith efforts to pay his 2012 tax debt. The Court gave due consideration to Mr. Tallis's assertion of his efforts to maximize the Judgment and Eagle Proceeds recovery.

### b.   The IRS served Mr. Tallis with an IRS administrative summons

On October 17, 2017, Mr. Dodgen served Mr. Tallis with an IRS administrative summons requiring Mr. Tallis to appear before the IRS on November 15, 2017, to give testimony and to produce for examination certain books, records, papers, and other data regarding Mr. Tallis's 2012 tax return.[63] Mr. Tallis failed to respond, appear, or otherwise comply with the summons.

On December 7, 2017, counsel for the IRS sent Mr. Tallis a "last chance" letter indicating that unless Mr. Tallis provided the testimony, documents, records, or other information described in the summons by January 3, 2018, legal proceedings would be brought against him.[64] Mr. Tallis again failed to respond, appear, or otherwise comply with the "last chance" letter.

On March 15, 2018, the IRS filed its *United States (IRS) Petition to Enforce IRS Summons*,[65] requesting the United States District Court enter an order enforcing the IRS administrative summons. On March 30, 2018, the United States Magistrate Judge issued an order requiring Mr. Tallis to appear in person on April 17, 2018, to show cause for why he should not be ordered to

---

[61] Ex. G-1; Tallis Test. Tr., Adv. ECF No. 100, at 17:2 – 19:8.
[62] Exs. G-2 and G-55.
[63] Ex. G-63.
[64] *Id.* at page 29 of 36.
[65] *United States of America v. Sam Tallis*, Civil Action No. 3:18-CV-0601-B-BK, (N.D. Tex. May 11, 2018).

comply with the IRS administrative summons. Mr. Tallis failed to appear before the United States Magistrate Judge as required by the show cause order.

On May 11, 2018, the United States District Court entered its *Order Accepting Findings and Recommendation of the United States Magistrate Judge*,[66] ordering Mr. Tallis to appear before IRS Revenue Officer, Mr. Dodgen, on May 25, 2018, to testify and produce all documents and records specified in the IRS administrative summons. Mr. Tallis appeared for his oral summons interview with Mr. Dodgen as required by the order.[67]

  *c. The IRS files suit and obtains a judgment against Mr. Tallis and Shale Exploration*

On January 3, 2018, the IRS filed its *United States' (IRS) Complaint*[68] (the "**District Court Complaint**") against Mr. Tallis and Shale Exploration in the United States District Court for the Northern District of Texas (the "**District Court**").[69] The IRS sought (i) to reduce Mr. Tallis's 2012 income tax debt to a judgment, (ii) to foreclose its tax liens, and (iii) a determination that Shale Exploration is the alter ego of Mr. Tallis.

On May 9, 2018, the District Court entered a default judgment[70] against Mr. Tallis in the amount of $21,494,154.40 plus pre-judgment and post-judgment interest. In addition, the District Court found that Shale Exploration was the alter-ego of Mr. Tallis. On November 29, 2018, the District Court entered an amended judgment[71] against Mr. Tallis (the default judgment and amended judgment, together, the "**IRS Judgment**").

---

[66] Ex. G-63.
[67] Ex. G-12
[68] Ex. G-14.
[69] *United States of America v. Sam Tallis*, Civil Action No. 3:18-CV-0015-G, (N.D. Tex. January 3, 2018).
[70] Ex. G-2.
[71] Ex. G-4.

### d. The District Court appoints a receiver to enforce the IRS Judgment

On April 16, 2019, the District Court entered an order[72] providing, in part, the appointment of Ms. Anne Ellouise Sweetser as receiver (the "***Receiver***") to enforce the IRS Judgment.[73] The Order made clear that the Receiver was vested with complete jurisdiction and control over not only Mr. Tallis, but also over Tallis Group and all its assets.[74] The Order specifically referenced the Carleton Avenue Property.

### e. The Carleton Avenue Property

The Carleton Avenue Property is emblematic of how Mr. Tallis and the Tallis Parties delayed and hindered the IRS from seeking collection of Mr. Tallis's past due 2012 tax debt. The Carleton Avenue Property is also illustrative of the questionable business practices and activities of the Tallis Parties as well as Mr. Greehey and his businesses. For example, the following is Mr. Greehey's testimony concerning his involvement with the acquisition and subsequent transfer of the Carleton Avenue Property:

> Q:      [By Mr. Lena – Council for the IRS] Okay. I want to turn your attention now to—you mentioned earlier some—some purchases by Shale: the jewelry and vehicles and political donations and all. But I want to turn to real property. And specifically, I want to look at 1709 Carleton in Fort Worth, which is a residence. And can you tell me about 1709 Carleton and then—and—
>
> A:      [By Mr. Greehey] Sure. Sam wanted to buy a house in Fort Worth. Said he had found this house. He had some problems with an ex-girlfriend of his . . . That he had some kind of conflict with her and they had some—so he wanted me to buy the house for him and hold it until he got that settled, and then he would take it, take it over, and then, you know. So I bought the house, put it in our name, and then he was supposed to come back and tell me where to—he said he wanted to put it in Tallis something. I forget his company. Tallis—

---

[72] Ex. G-5.
[73] Ex. G-5.
[74] *Id. See also* Ex. G-6.

Q:      Tallis Group?

A:      Yeah. Tallis Group.

Q:      And this—

A:      And so he never came back, he never would do anything, and I was paying the insurance, and I didn't need that, so I just went ahead and deeded it over to him, into Tallis Group.

Q:      And the acquisition of 1709 Carleton in 2012 and then your transfer in 2013, does that sound about right?

A:      Correct.

. . .

Q:      Okay. For 1709 Carleton, we've seen documents indicating the purchase price of that was $1.2 million.

A:      That sounds about right.

Q:      Okay. And what funds were used to pay for—

A:      Those came out of Greehey & Company.

Q:      Okay. When you transferred 1709 Carleton to Tallis Group in 2013, tell me, did Sam Tallis or Tallis Group pay Greehey & Company any monies for 1709—

A:      No. No.

Q:      And there wasn't a mortgage or any encumbrances on 1709 Carleton when it was transferred, were there?

A:      No

So Mr. Greehey testified that he caused Greehey & Company Ltd. to use its own funds to purchase the Carleton Avenue Property for approximately $1.2 million to enable Mr. Tallis to shield the true ownership of the home.[75] Then almost a year later, and not requiring any

---

[75] Ex. G-26 (*General Warranty Deed* dated May 11, 2012, conveying the Carlton Avenue Property to Greehey & Company, Ltd).

consideration in return from any of the Tallis Parties, Mr. Greehey simply caused Greehey & Company to convey the Carleton Avenue Property—valued at more than $1.2 million and free and clear of any liens—to Tallis Group.[76] This is but one example of why the Court found the testimony of Mr. Tallis and Mr. Greehey to lack credibility regarding their business practices and the transactions and disputes between them.

Mr. Greehey caused the Carleton Avenue Property to be conveyed to Tallis Group on March 22, 2013, free and clear of any liens. From March 2013 through April 2021, Mr. Tallis and his former fiancée lived in the Carleton Avenue Property. During that entire eight-year time period, Mr. Tallis had many opportunities to use the over $1.2 million of equity in the Carleton Avenue Property to apply toward his past due 2012 tax debt, but he never did. Rather, on March 9, 2015, Mr. Tallis took out a loan for $810,000 using the Carleton Avenue Property as collateral.[77] Mr. Tallis did not use any of the $810,000 loan proceeds to pay down his past due 2012 tax debt.[78]

Mr. Tallis testified that in December 2017, he and his former fiancée entered into an alleged lease agreement where his former fiancée agreed to pay Mr. Tallis $7,000 per month in rent to live in the Carleton Avenue Property.[79] Mr. Tallis admitted, however, that he did not declare any rental income on his 2018 tax return.[80] Overall, the Court found Mr. Tallis's testimony regarding his business relationship with his former fiancée—including but not limited to the lease agreement regarding the Carleton Avenue Property—not credible or believable. Mr. Tallis could have used some or all the $7,000 per month rental income he allegedly received from his former fiancée to pay down his past due 2012 tax debt, but he did not.

---

[76] Ex. G-27
[77] Bankr. ECF No. 41, Exhibit A - *Promissory Note*
[78] Tallis Test. Tr., Adv. ECF No. 100, at 98:13 – 99:14.
[79] Ex. G- 43; Tallis Test. Tr., Adv. ECF No. 100, at 78:19 – 79:4.
[80] Ex. G-19.

In conclusion, with respect to the Carleton Avenue Property, Mr. Tallis had ample opportunity to cooperate with the IRS to sell the Carleton Avenue Property anytime from 2013 on and use the resulting sales proceeds to pay down his past due 2012 tax debt, but he did not. Further, Mr. Tallis could have used the alleged $7,000 per month rental income to pay down his 2012 tax debt, but he did not. Finally, Mr. Tallis could have cooperated with the Receiver from and after April 16, 2019, to sell the Carleton Avenue Property and use the net sale proceeds to pay down his past due 2012 tax debt, but again, he did not.

One last disturbing action by Mr. Tallis regarding the Carleton Avenue Property was revealed during the trial. After the Receiver was appointed, she provided Mr. Tallis with repeated notices to vacate the Carleton Avenue Property, but he refused, which violated the April 16, 2019, District Court Order. The Receiver then provided Mr. Tallis one last written notice to vacate the Carleton Avenue Property on or before April 30, 2021, which was two years after the Receiver had been appointed to, in part, sell the Carleton Avenue Property. Mr. Tallis failed to vacate the Carleton Avenue Property by April 30, 2021. Therefore, on May 12, 2021, the Receiver—accompanied by U.S. Marshals, two Fort Worth police officers, and a locksmith—re-keyed and changed all the locks at the Carleton Avenue Property. The Receiver also affixed notices on the front door stating that the Carleton Avenue Property had been seized pursuant to the District Court Order. The Receiver then took photos of the contents including a large cache of firearms, ammunition, bins of firearm clips, high-capacity magazines, and other related firearm accessories. That evening, the Receiver, the U.S. Marshals, the Fort Worth police officers, and the locksmith then left the premises.

Specifically concerned about the large cache of firearms and related firearm ammunition and accessories found in the Carleton Avenue Property, the Receiver arranged for the Bureau of

Alcohol, Tobacco, Firearms and Explosives (the "*ATF*") officials and representatives of the United States Department of Justice to meet her at the Carleton Avenue Property the next afternoon—May 13, 2021—so that the ATF officials could take possession of the large cache of firearms, ammunition, and related firearm accessories. Upon returning to the Carleton Avenue Property the next day, the Receiver discovered that someone—who was later confirmed to be Mr. Tallis and a Mr. Matthew Tarver[81]—had torn down the notices that had been placed on the front door the day before; illegally broken into the property; and removed all the firearms, ammunition, and related firearm accessories that were in the Carleton Avenue Property.

Mr. Tallis's actions in the late-night-hours of May 12, 2021, or early morning hours of May 13, 2021, violated the District Court Order and possibly constituted a criminal trespass and theft of property that had arguably been forfeited to the United States under the District Court Order. At a minimum, Mr. Tallis's ill-advised actions constitute additional evidence of his actions to willfully impede and evade the payment of his past due 2012 tax debt.

## D. Procedural Status—Adversary Proceeding and Summary-Judgment Filings

On May 5, 2019, Mr. Tallis filed his Chapter 7 bankruptcy petition,[82] and on October 16, 2019, the IRS filed its Complaint[83] commencing this adversary proceeding. The Complaint contains one count—seeking denial of the discharge of Mr. Tallis's more than $15 million of unpaid 2012 federal income tax liability pursuant to 11 U.S.C. § 523(a)(1)(C).

Mr. Tallis filed his Answer[84] to the Complaint on February 3, 2020.

---

[81] Sweetser Test. Tr., Adv. ECF No. 91, at 135:23 – 137:7; Tallis Test. Tr., Adv. ECF No. 92, at 153:8 – 160:4. .

[82] Bankr. ECF No. 1.

[83] Adv. ECF No. 1.

[84] *Debtor's Response to United States' (IRS) Complaint to Determine Dischargeability,* Adv. ECF No. 11 (the "*Answer*").

On July 13, 2020, Mr. Tallis filed a motion for summary judgment[85] and on August 11, 2020, the IRS filed a cross-motion for summary judgment.[86] On August 27, 2020, the Court entered orders denying both Mr. Tallis's and the IRS's summary judgment motions.[87]

The Complaint then came on for trial, which lasted eight full days.

## III. LEGAL ANALYSIS

The Bankruptcy Code is intended to provide relief to the "honest but unfortunate debtor."[88] Such honest but unfortunate debtors are generally granted a discharge from all debts arising prior to the filing of the bankruptcy petition.[89] The Bankruptcy Code provides further, however, that a debt for a tax "with respect to which the debtor . . . *willfully attempted* in any manner to evade or defeat such tax" may not be discharged.[90]

When analyzing the § 523(a)(1)(C) exception to discharge, the Fifth Circuit has held that the "willfully attempted" element contains both (i) a "conduct requirement (that the debtor 'attempted in any manner to evade or defeat [a] tax'), and (ii) a mental state requirement (that the attempt was done 'willfully')."[91] The party arguing against dischargeability of such a tax debt— here, the IRS—must prove the application of the exception by a preponderance of the evidence.[92]

---

[85] *Defendant's Motion for Summary Judgment*, Adv. ECF No. 27.
[86] *United States' (IRS) Response to Tallis' Motion for Summary Judgment and United States' Cross-Motion for Summary Judgment and Brief in Support*, Adv. ECF No. 30.
[87] *Order Denying Defendant's Motion for Summary Judgment*, Adv. ECF No. 56; *Order Denying Plaintiff's Cross-Motion for Summary Judgment*, Adv. ECF No. 59.
[88] *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991).
[89] 11 U.S.C. § 727(b).
[90] 11 U.S.C. § 523(a)(1)(C) (emphasis added).
[91] *United States v. Coney*, 689 F.3d 365, 371 (5th Cir. 2012) (citing *In re Fegely*, 118 F.3d 979, 983 (3rd Cir. 1997)).
[92] *Coney*, 689 F.3d at 371 (citing *In re Grothues*, 226 F.3d 334, 337 (5th Cir. 2000)).

### A. The Conduct Requirement

The Court finds that the IRS has satisfied the conduct requirement of the willfully attempted element of § 523(a)(1)(C) because the factors for the indicia of conduct weigh against Mr. Tallis.

To satisfy the conduct requirement, the debtor must have "attempted in any manner to evade or defeat [a] tax."[93] When analyzing whether the requirement has been met, courts consider the "totality of the circumstances" by evaluating several different factors as indicia of attempts to evade or defeat tax obligations.[94]

Conduct indicia may include (i) understating income for more than one year, (ii) implausible or inconsistent behavior, (iii) extensive dealings in cash, (iv) failure to cooperate with the IRS, (v) poor record keeping, (vi) transferring assets to family members, (vii) transferring assets for inadequate consideration, (viii) transfer[s] that greatly reduce assets subject to IRS execution, (ix) transfers made in the face of serious financial difficulties, (x) failing to acquire significant assets relative to a debtor's earnings, (xi) failing to file tax returns, and (xii) any other conduct that is likely to mislead or conceal.[95] Several of the above factors are present in this case.

- *Mr. Tallis understated his income for more than a year.*

Here, Mr. Tallis admitted that he did not declare any rental income on his 2018 tax return that he received from his former fiancée. This factor weighs against Mr. Tallis.

- *Mr. Tallis failed to fully cooperate with the IRS regarding the payment of his past due 2012 tax debt.*

---

[93] *Coney*, 689 F.3d at 371 (citing *In re Fegely*, 118 F.3d at 983).
[94] *United States v. Mixon* (*In re Mixon*), No. 05-86866-BJH-7, 2008 WL 2065895, at *7-10 (Bankr. N.D. Tex. May 13, 2008).
[95] *Hamm v. United States* (*In re Hamm*), 356 B.R. 263, 276-77 (Bankr. S.D. Fla. 2006); *Roller v. United States* (*In re Roller*), No. 17-1353-BKC-MAM-A, 2018 WL 7017738, at *6 (Bankr. S.D. Fla. 2018).

As detailed above, Mr. Tallis failed to cooperate with the IRS. Specifically, Mr. Tallis failed to respond or otherwise comply with (i) the IRS administrative summons issued on October 17, 2017, (ii) the "last chance" letter sent to Mr. Tallis on December 7, 2017, and (iii) the March 30, 2018, show cause order entered by the United States Magistrate Judge. Additionally, Mr. Tallis failed to corporate with the Receiver regarding the Carleton Avenue Property. Finally, but-for the initial $25,000 payment Mr. Tallis made to the IRS on April 15, 2013, Mr. Tallis has not made any other voluntary payments to the IRS for his past due 2012 tax debt.

Because the overwhelming credible evidence before the Court establishes that Mr. Tallis failed to fully cooperate with the IRS regarding the payment of his past due 2012 tax debt, this factor weighs heavily against Mr. Tallis.

- *Mr. Tallis failed to keep accurate personal or business records.*

As detailed above, the overwhelming uncontroverted evidence established that the Tallis Parties' books and records were woefully inadequate, a mess, and not credible. This factor weighs heavily against Mr. Tallis

- *Mr. Tallis transferred (or caused to be transferred) hundreds of thousands, if not millions of dollars, to family and friends.*

Here, the overwhelming uncontroverted evidence established that the Tallis Parties' paid hundreds of thousands, if not millions of dollars, to or for the benefit of Mr. Tallis's mother, former fiancée, and other family members. This factor weighs heavily against Mr. Tallis.

- *Mr. Tallis transferred assets for inadequate consideration*

The credible evidence suggested that many transfers of assets to Mr. Tallis's family and fiancée were for nominal consideration. This factor weighs against Mr. Tallis.

- *Mr. Tallis transferred (or caused transfers) that greatly reduced assets that could have been subject to IRS execution.*

Again, the overwhelming credible evidence established that the Tallis Parties transferred assets or granted lien interests in assets that greatly reduced available assets that the IRS could execute. For example, the Tallis Parties transferred cash for the purchase of real estate properties. The Tallis Parties then obtained loans using the real estate properties as collateral. The transfers of such lien interests in the real estate properties substantially reduced the net value of the real estate assets upon which the IRS could have executed. None of these loan proceeds were used to reduce Mr. Tallis's 2012 tax debt with the IRS. Then, the Tallis Parties eventually sold most of the real estate properties and spent the net proceeds on items other than reducing Mr. Tallis's 2012 tax debt with the IRS.

At trial, Mr. Tallis testified that he tried to sell certain real estate assets for the benefit of the IRS,[96] but the IRS refused to accept or take advantage of his efforts. Mr. Tallis's attorney, Mr. Carrold Ray ("**Mr. Ray**"), corroborated Mr. Tallis's testimony.[97] Mr. Tallis and Mr. Ray testified that while some of their proposed sales of real estate assets would not have resulted in a net payment to the IRS, such sales would have improved the IRS's position by significantly paying down the mortgage.[98] The Court took due consideration of this testimony when analyzing this factor. Such efforts, however, are significantly outweighed by the previously discussed transfers, which greatly reduced the assets that could have been subject to IRS execution.

Finally, as detailed above, the Tallis Parties transferred millions of dollars to pay for personal expenditures by or for the benefit of Mr. Tallis. Each of the personal expenditures made

---

[96] Tallis Test. Tr., Adv. ECF No. 100, at 133:8-23.
[97] Ray Test. Tr., Adv. ECF No. 91, at 12-13:18-6.
[98] Ray Test. Tr., Adv. ECF No. 91, at 15:20 – 16:25.

by or at the direction of Mr. Tallis reduced assets that could otherwise have been available and subject to IRS execution. Accordingly, this factor weighs against Mr. Tallis.

- *Mr. Tallis transferred assets (or caused such transfers) in the face of serious financial difficulties.*

The record is replete with overwhelming and uncontroverted evidence establishing that the Tallis Parties transferred millions of dollars for personal expenditures, including real estate properties, luxury automobiles, firearms, jewelry, ill-advised investments, and many other expenditures, as well as transfers and gifts made to family and friends, all while the Tallis Parties were in the face of serious financial difficulties. This factor weighs against Mr. Tallis.

- *The Tallis Parties failed to file tax returns.*

Although not previously discussed, the credible and uncontroverted evidence established that one or more of the Tallis Parties failed to file tax returns due for 2014, 2015, 2016, and 2017.[99] Mr. Tallis's explanation for not having filed tax returns for those years was not credible. In addition, although Mr. Tallis filed a tax return for 2018, the evidence establishes he underreported his taxable income on his 2018 tax return. Mr. Tallis testified that he had received lease payments from his former fiancée under the Carleton Avenue Property lease agreement, yet no such income is included in his 2018 tax return.

Based on the totality of circumstances, and after evaluating the typical factors indicating efforts to evade or defeat a tax obligation, the Court finds and concludes that the IRS has satisfied its burden in proving the conduct requirement, which is the first requirement of the "willfully attempted" element under § 523(a)(1)(C).

---

[99] Tallis Test. Tr., Adv. ECF No. 100, at 41:18–20; Tallis Test. Tr., Adv. ECF No. 88, at 166:16-20.

**B.      The Mental State Requirement**

The Court finds that the IRS has satisfied the mental state requirement of the willfully

attempted element of § 523(a)(1)(c) because Mr. Tallis fails the Bruner test,

When analyzing the second requirement of the "willfully attempted" element of §

523(a)(1)(C)—the "mental state" requirement—courts look to whether the debtor's attempts to

avoid a tax liability were "voluntary, conscious, and intentional."[100] In making this determination,

courts employ a three-pronged test (the "***Bruner Test***"), considering whether the debtor (i) had a

duty to pay taxes under the law, (ii) knew he or she had that duty, and (iii) voluntarily and

intentionally violated that duty.[101]

- *Mr. Tallis had a duty to pay taxes under the law and knew he had a duty to pay taxes under the law.*

Regarding the first two prongs of the Bruner test, Mr. Tallis admitted that he had a duty to

pay taxes under the law and he knew he had a duty to pay his taxes under the law.[102] Therefore,

the first two prongs of the *Bruner* test have been satisfied.

- *Mr. Tallis voluntarily and intentionally violated that duty.*

To satisfy the third prong of the Bruner Test, the IRS must establish that Mr. Tallis

"voluntarily and intentionally committed or attempted to commit an affirmative act or culpable

omission that, under the totality of the circumstances, constituted an attempt to evade or defeat the

assessment, collection, or payment" of his 2012 tax liability.[103] In other words, the act or acts

---

[100] *In re Birkenstock*, 87 F.3d 947, 952 (7th Cir. 1996).
[101] *United States v. Stanley*, 595 F.App'x 314, 318 (5th Cir. 2014), (citing *Coney*, 689 F.3d at 371); *see also In re Bruner*, 55 F.3d 195, 197 (5th Cir. 1995).
[102] Tallis Test. Tr., Adv. ECF No. 101, at 13:22 – 14:4.
[103] *Coney*, 689 F.3d at 374.

satisfying the conduct requirement must have been voluntary and intentional. "The debtor need not have made [his or her] attempt with the specific intent to defraud the IRS."[104]

When determining "voluntarily and intentionally", or willfulness, in the tax evasion context, failure to pay taxes alone is insufficient to bar the discharge of a tax liability.[105] However, failure to pay taxes in conjunction with the failure to file subsequent tax returns may indicate a willful state of mind.[106] Similarly, though not dispositive, a debtor's failure to pay taxes when he or she had the ability to pay can suggest willfulness.[107] Other indicators of a debtor's intent can be drawn through circumstantial evidence and reasonable inferences drawn from the existence of certain fact patterns, commonly known as badges of fraud.[108]

These badges of fraud traditionally include: (i) the recurrence of the understatement of income for more than one tax year, (ii) the understatement of income, (iii) implausible or inconsistent explanations of behavior, (iv) inadequate records, (v) transfer of assets to a family member, (vi) transfer for inadequate consideration, (vii) transfer that greatly reduced assets subject to IRS execution, and (viii) transfers made in the face of serious financial difficulties.[109] No single factor is determinative. The analysis of a debtor's intent proceeds on the totality of the circumstances.[110]

---

[104] *Id.*

[105] *In re Birkenstock*, 87 F.3d at 951; *see also In re Haas*, 48 F.3d 1153, 1158 (11th Cir. 1995).

[106] *Stanley*, 595 F.App'x at 318; *see also Stamper v. United States* (*In re Gardner*), 360 F.3d 551, 557 (6th Cir. 2004).

[107] *Stanley*, 595 F.App'x at 318.

[108] *United States v. Gandy* (*In re Gandy*), Adv. No. 15-05083-CAG, 2016 WL 7174610, at *6 (Bankr. W.D. Tex. Nov. 4, 2016).

[109] *United States v. Spiwak* (*In re Spiwak*), 285 B.R. 744, 751 (S.D. Fla. 2002); *see also In re Greene*, 207 B.R. 21, 25 (Bankr. M.D. Fla. 1997).

[110] *See In re Mixon*, 2008 WL 2065895 at *6.

Here, the following badges of fraud are present from which the Court can draw a reasonable inference that Mr. Tallis voluntarily and intentionally violated his duty to pay his past due 2012 tax debt.

- o *Mr. Tallis understated his income for more than a year.*

For the same reasons detailed above, the overwhelming, uncontroverted evidence established that Mr. Tallis understated his income for more than a year. This factor weighs against Mr. Tallis.

- o *Mr. Tallis failed to keep accurate personal or business records.*

For the same reasons detailed above, the overwhelming, uncontroverted evidence established that the Tallis Parties' books and records were woefully inadequate, a mess, and not credible. This factor weighs against Mr. Tallis.

- o *Mr. Tallis transferred (or caused to be transferred) hundreds of thousands, if not millions of dollars, to family and friends.*

For the same reasons detailed above, the overwhelming evidence established that the Tallis Parties' paid hundreds of thousands, if not millions, of dollars to or for the benefit of Mr. Tallis's mother, former fiancée, and other family members. This factor weighs against Mr. Tallis.

- o *Mr. Tallis transferred assets for inadequate consideration*

For the same reasons detailed above, the overwhelming evidence established that Mr. Tallis transferred assets for inadequate consideration. This factor weighs against Mr. Tallis.

- o *Mr. Tallis caused transfers of assets that greatly reduced assets that could be subject to IRS execution.*

For the same reasons detailed above, the overwhelming evidence established that the Tallis Parties caused transfers of assets and lien interests in assets that greatly reduced available assets that could have been subject to IRS execution. This factor weighs against Mr. Tallis.

     ○  *Mr. Tallis caused transfers to be made in the fact of serious financial difficulties.*

For the same reasons detailed above, the overwhelming evidence established that the Tallis Parties transferred millions of dollars for personal expenditures including real estate properties, luxury automobiles, firearms, jewelry, ill-advised investments, and transfers to or for the benefit of family and friends—all while the Tallis Parties were facing serious financial difficulties. This factor weighs against Mr. Tallis.

After having weighed each of the above factors, the Court finds and concludes that the IRS has satisfied its burden to establish that the third prong of the Bruner test has been satisfied.

## IV.    CONCLUSION

Based on the totality of circumstances and after having evaluated the relevant factors, the Court finds and concludes that the IRS has satisfied its burden to establish both the conduct requirement and the mental state requirement necessary to find that Mr. Tallis "willfully attempted" to evade or defeat payment of his 2012 tax debt. Consequently, Mr. Tallis's 2012 tax debt shall be excepted from being discharged under § 523(a)(1)(C).

The Court will enter a separate final judgment consistent with this Memorandum Opinion.

### ### END OF MEMORANDUM OPINION ###